WALKER <i>et al. v.</i> STEERS <i>et al.</i>

(<i>Supreme Court, General Term, Fourth Department.</i> April, 1891.)

1. WILLS—REVOCATION—INCONSISTENT CONTRACT.
   Testator bequeathed to defendant S. certain patents "in consideration that the said S. will carry on the business of making and selling machinery under these patents for ten years after my decease, and that he will" pay one-half of the net profits of the business to a certain church, "and at the end of said ten years the said S. to become the absolute owner of the patents and the business of making and selling them." Afterwards testator and S. entered into a partnership agreement by which they were to manufacture under the patents for a term of five years and to share the profits and losses in certain proportions, and "in case of the death of either copartner before the time hereinbefore limited for the termination of the copartnership, the firm business shall notwithstanding be continued by the survivor until the said full term of five years shall have expired, the profits and losses" to be shared in certain proportions, and at the end of the term the firm name, good-will, and patents to become the sole property of the survivor. <i>Held,</i> that such provision of the will was revoked by the contract; 4 Rev. St. N. Y. (8th Ed.) p. 2549, § 48, providing that any act of a testator wholly inconsistent with a previous testamentary disposition of his property shall operate a revocation thereof.

2. PARTNERSHIP—DEATH OF PARTNER—CONTINUATION OF BUSINESS.
   A contract of partnership by which it is agreed that, if one of the partners shall die within the period limited for the duration of the firm, the business shall be continued until the end of the term, is valid.

Appeal from judgment on report of referee.

Action by Henry B. Walker and others, executors, etc., of Schuyler B. Steers, deceased, against Delos Steers, Frederick A. Saville, and others, for the construction of the will of Schuyler B. Steers, who died at Cooperstown, Otsego county, December 13, 1889, where he then resided. The will is dated July 15, 1886, and was duly admitted to probate by the surrogate of Otsego county on December 28, 1889. In this will the testator, after providing for the payment of debts and funeral expenses, gave to his wife $50,000 and all his household furniture, horses, carriages, and pictures, except his saddle-horse Daniel Boone. He then gave certain specific legacies to the amount of about $42,000. Then in the tenth clause of the will, after a bequest to his

late son-in-law, the appellant Saville, of his saddle-horse and his one share in the New Orleans Cotton Exchange, there came the following provision: "I also give and bequeath to said Frederick A. Saville an equal undivided half interest in the new Morse cotton-compress patents, dated May 28, 1878, May 23d, 1882, and Oct. 18th, 1882. Also an equal undivided half interest in the Stewart and Steers' and S. B. Steers' patents for bale ejectors, and the S. B. Steers' and L. C. Terry's bale-headers patents, together with all the compress patterns, tackle, etc. This bequest is in consideration that the said Saville will carry on the business of making and selling machinery under these patents for ten years after my decease, and that he will, after all the expenses of said business are paid, pay over and account at the beginning of each year for one-half the net avails and profits of the past year to the pastor and trustees of the First Presbyterian Church of New Orleans to found a fund to be kept invested by them, the income of which to be used by them to assist in the education of young men having the profession of a minister in view or for city missionary work; and at the end of said ten years the said Saville to become the absolute owner of the patents and the business of making and selling them. And I further will and direct that no compensation shall be paid the said Saville for his time and services during said ten years, except his half of the profits." Then, after giving to Saville a legacy of $10,000 and providing for the transfer to him of certain bonds given to his daughter on her marriage, and a legacy to another party of $5,000, there came the following: "Twelfth. I give and bequeath unto my beloved and good wife, Kate Clarke Steers, all the rest, residue, and remainder of my property, in trust, nevertheless, and to and for the following purposes; the same to be used to establish an institution in or near the village of Cooperstown, to be called the 'Mary and Edward Steers Home,' the object to be to provide a home for worthy indigent persons of one or both sexes, the style and character of such home to be decided and fixed upon by my beloved wife, together with my executors and the trustees of the Presbyterian Church in Cooperstown; the building to be erected, and the residue of the money to be invested as an endowment fund for the support of said home." He then appointed the plaintiffs executors, of whom Saville is one, and authorized them to sell real estate. The wife of the testator died on the 1st of June, 1888, so that the testator at his death left no widow, or child or descendant of a child. His daughter, who was the wife of Saville, died before the will was made. At the time of making the will, the testator and Saville were copartners in business at New Orleans, in the state of Louisiana, under the firm name of S. B. Steers & Co. The business of the firm at that time was selling and operating cotton compresses manufactured under the patents mentioned in the tenth clause of the will, and also doing business as cotton warehousemen. Steers had a two-thirds interest and Saville a one-third interest in the business, and the patterns used in manufacturing compresses and the tackle and machinery used in putting them up were owned by the firm in the same ratio. This partnership continued till the 14th of June, 1889, at which date the parties executed under their hands and seals and duly acknowledged articles of agreement "for the governing of their copartnership business and relations," whereby they agreed to become copartners "under the firm name of S. B. Steers & Co. in the business of manufacturing and selling the Morse cotton compressor and its attachments, of operating compresses and warehouses for the compressing and storing of cotton, and of transacting all kinds of business heretofore conducted by the firm; said copartnership to commence and date as of May 1st, 1889, and include all business transacted since that time, and to continue for the full term of five years." To that end they thereby contributed to the copartnership the existing assets of the firm of S. B. Steers & Co. and assumed their existing liabilities, and also contributed their and each of their interests in and to the Morse cotton-compressor patents owned by them or

either of them as said firm or individually, such assets and liabilities so contributed and assumed to be held, owned, and borne in proportion of two-thirds to Steers and one-third to Saville, each agreeing to devote their time and energies to the business as far as they were able, and share and divide the profits and losses thereof as follows: for the first two years in the proportion of two-thirds to Steers and one-third to Saville, and thereafter equally. The agreement also provided that, "in case of the death of either copartner before the time hereinbefore limited for the termination of the copartnership, the firm business shall notwithstanding be continued by the survivor until said full term of five years shall have expired, the profits and losses of said full term to be shared and divided between said survivor and the estate of said deceased copartner in the proportion and on the basis above agreed, so that the estate of said deceased copartner shall receive the same benefit from the business as though said copartner had lived; but at the expiration of said five years the interest of said deceased copartner shall cease and wholly determine, and all assets, profits, and losses then existing, save only the firm name, good-will, and said patents, shall be divided between said survivor and the estate of said deceased copartner in the proportion and on the basis above agreed, that is to say, all assets, profits, and losses, in whatever form existing, being earned or made prior to the expiration of the first two years of the copartnership, shall be divided in the proportion of two-thirds to the said Schuyler B. Steers or his estate and one-third to the said Frederick A. Saville or his estate, and all assets, profits, and losses, in whatever form existing or applied, earned and made after the expiration of said first two years, shall be divided equally. The firm name, good-will, and said patents shall not be sold or divided, but shall be and become the sole property of the survivor, who may thereafter continue the business for his own benefit in the firm name. But in case said Frederick A. Saville shall be such survivor and shall continue the business, then it is further agreed that for a further period of five years he shall pay to the estate of said Schuyler B. Steers a royalty of three thousand dollars for every compress sold. This agreement shall bind the heirs and representatives of the respective parties." The value of the estate left by the deceased after the payment of debts and expenses is about the sum of $100,000, consisting of both real and personal, the personal not being sufficient to pay the legacies, and was not at the date of the will, which fact was known to the testator. It is not found what was the amount of property invested by Steers in the firm. There is evidence that his interest was estimated at $20,000 to $30,000. The firm was somewhat embarrassed financially on June 14, 1889, to the knowledge of both parties. Prior to that date, and after the date of the will, Saville had acquired a one-third interest in the real estate used in the business. The referee, among other things, decided that all that part of the tenth clause which provided for a continuance of the partnership business after the death of the testator and the payment of a portion of the avails to the New Orleans church, including the bequest of the patents, patterns, tackle, etc., and the business of making and selling as therein described, was revoked by the provisions of the contract of June 14, 1889, and all the rights which Saville has acquired in and to said business and property are such as arise out of the provisions of that contract, excepting the interest therein which was theretofore vested in him independent of the provisions of the will; that Saville as surviving partner is entitled to retain in his hands and under his control all the assets and property of the firm for the purpose of discharging its liabilities and performing its obligations, and if he fulfills the terms of the contract will be entitled to the benefit of the provisions in his favor, but cannot as survivor create any debt or obligation for which the separate estate of the testator can be made liable; that the bequest in the tenth clause is void for indefiniteness and uncertainty in regard to the beneficiaries of the proposed trust and the manner of its execution, and

is also inoperative by reason of the death of the sole trustee.   Saville and the First Presbyterian Church of New Orleans, its pastor and trustees, appeal.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

*Charles T. Brewer*, for appellants.   *James A. Lynes*, for respondents.

MERWIN, J.   The contention of the appellants is that the decision of the referee, so far as he holds that the tenth clause of the will is revoked by the contract of June 14, 1889, is erroneous.   The theory of the respondents is that the provisions of the contract are wholly inconsistent with that part of the will, and therefore amount to a revocation within section 48, tit. 1, c. 6, pt. 2, of the Revised Statutes.   4 Rev. St. (8th Ed.) 2549.   The theory of the appellants is that the contract is not wholly inconsistent, and also that it is not a valid instrument.   The real question in substance is whether the New Orleans church shall under the will share in the future avails of the business, or whether under the contract they shall be paid to the estate generally and be distributed as general assets, thus in effect benefiting the residuary legatee, or, if the residuary bequest is invalid, then going to the next of kin.   By section 47 of the title above referred to it is provided that a conveyance, settlement, deed, or other act of a testator, by which his estate or interest in property previously devised or bequeathed by him shall be altered - but not wholly divested, shall not be deemed a revocation of the devise or bequest of such property, but such devise or bequest shall pass to the devisee or legatee the actual estate or interest of the testator which would otherwise descend to his heirs or pass to his next of kin, unless in the instrument by which such alteration is made the intention to revoke is declared.   Section 48 is as follows: "But if the provisions of the instrument by which such alteration is made are wholly inconsistent with the terms and nature of such previous devise or bequest, such instrument shall operate as a revocation thereof, unless such provisions depend on a condition or contingency, and such condition be not performed or such contingency do not happen."   So that, in the present case, although the testator was not wholly divested of his interest in the property, still the contract, if valid, would operate as a revocation if its provisions were wholly inconsistent with the terms and nature of the bequest.   The testator at the time of making the will was the entire owner of the patents there referred to.   A partnership then existed between him and Saville that was engaged in selling and operating cotton compressors manufactured under the patents.   The testator had a two-thirds interest in the business and Saville a one-third, and the patterns, tackle, and machinery were owned by the firm in the same proportion.   This partnership was formed in September, 1885, but whether for any definite time does not appear.   By the will Saville is given an undivided half of the patents, patterns, tackle, etc., in consideration that he will carry on the business of making and selling machinery under the patents for ten years after the testator's decease and pay annually to the New Orleans church one-half of the net avails and profits; Saville at the end of the ten years to become the absolute owner of the patents and the business of making and selling them.   By the contract the partnership was to continue for the definite period of five years from May 1, 1889.   By its terms Saville became the owner of one-third of the patents.   The profits and losses were to be divided for the first two years in the proportion of two-thirds to Steers and one-third to Saville, and thereafter equally.   In case of death of either before the expiration of the five years the firm business was to be continued by the survivor to the end of the term, the profits and losses to be divided in the same proportion as if both had lived, and at the close of the term there was to be a division in the same proportion of all the assets, profits, and losses then existing, except that the firm name, good-will, and patents should become the sole property of the survivor, and he might thereafter continue the business for his own benefit in the firm name.   If, however, Saville was the survivor

and should continue the business, it was agreed that he should pay the estate of Steers a royalty of $3,000 for every compress sold. Both the will and the contract related to the business of making and selling machinery under the same patents. The will provided for a ten-years term and the final ownership by Saville of the patents and the business. The contract, in the contingency of Saville being the survivor, provided for the same result at the end of five years, with a provision on his part to pay the estate of Steers a royalty for a further period of five years. The will provided for the payment by Saville of one-half the net profits to the New Orleans church for the ten years; the contract provided for the payment to Steers or his estate of two-thirds the profits for two years and one-half for the balance of the time. The contract covered the whole subject. The continuance and closing up of the business, the division of the assets and profits, and the final ownership of the patents were all provided for. The patents expired in 1898, before the termination of the operation of the contract. Nothing was therefore left for the will to act upon. It may therefore be well said that the provisions of the contract are wholly inconsistent with the terms and nature of the bequest. There would seem to be no doubt about the intention of Steers. The situation had materially changed after the date of the will. There was a change in the ownership, and the firm had become financially embarrassed. Very clearly the design of Steers was that the contract should take the place of the provision of the will. The estate is entitled to have the contract, if valid, carried out. Saville himself is in the attitude of claiming benefits under it. It is not claimed that the New Orleans church can take the proceeds under the contract. See *Beck* v. *McGillis*, 9 Barb. 59, and cases there cited. *McNaughton* v. *McNaughton*, 34 N. Y. 203.

It is further claimed by the appellants that the contract, so far as it provides for the continuance of the business by the survivor with a division of the profits and losses for the full term, is void. This question is not raised in the answers of the appellants or by any request for findings. We will, however, assume that the question is before us. The cases of *Ross* v. *Hardin*, 79 N. Y. 84, *Bank of Newburgh* v. *Bigler*, 83 N. Y. 52, and *Stewart* v. *Robinson*, 115 N. Y. 328, 22 N. E. Rep. 160, 163, are cited on the subject. It is not claimed that either of these cases decides the question. At most they suggest some doubts. In the *Ross Case* the action was brought to recover the value of services rendered by plaintiff at the request of defendant's intestate, in the care of certain property intermediate the death and the appointment of an administrator. CHURCH, C. J., in the opinion says: "It is very clear, I think, that a person cannot by a contract supersede or contravene the laws in respect to the management and devolution of property in cases of intestacy. The statute has provided a mode of doing this by will, but the requirements of the statute must be complied with." He, however, sees no reason why a party may not make a valid contract for the care of his property from his death to the appointment of an administrator. This question, however, was not passed upon, the plaintiff being beaten upon another ground. In the *Bank of Newburgh Case* it was held that a surviving partner had no authority to bind the estate of the deceased partner by new accommodation indorsements, or by renewal of old indorsements of that character made in the lifetime of the deceased, although there was a provision in the articles of partnership that the survivor should continue to carry on the business for the benefit of both parties for a specified time after the death; it being said that the authority thus conferred, if held to be operative, would not be sufficient. In the *Stewart Case* there was a provision like the one in the present case, and the question was whether the estate generally of the deceased was liable for new debts contracted by the survivor. It was held not, it being said to be not necessary to determine the question raised by the respondents that the agreement was not valid for any purpose. In *Re Laney*, 2 N. Y. Supp. 443, the agree-

ment was that in case of the death of any of the parties before the expiration of the term, which was seven years, the copartnership should not be dissolved, but be continued by the survivor under the same firm name to the expiration of the term, and the share of the deceased partner in the profits be paid to his representative. One of the partners died in about two years. In an accounting by his administrator, who was also one of the survivors, it was expressly held that the agreement was valid, and the account was settled on that basis. It was said that under the agreement it was the duty of the survivors to continue the business for the benefit of the estate of the deceased as well as for their own benefit during the time fixed by the articles, and that by virtue of its prescribed contribution to the capital stock the estate is entitled to its share of the profits according to the provisions of the contract. This case was affirmed by the court of appeals without opinion. 119 N. Y. 607, 23 N. E. Rep. 1143. In *Scholefield* v. *Eichelberger*, 7 Pet. 594, it is said that there is no doubt that the liability of a deceased partner as well as his interest in the profits of a concern may by contract be extended beyond his death. This doctrine Judge STORY indorses in *Burwell* v. *Mandeville's Ex'r*, 2 How. 576. In *Wild* v. *Davenport*, 48 N. J. Law, 137, 7 Atl. Rep. 295, it was held that a stipulation in partnership articles that upon the death of a partner his capital shall remain in the business until the expiration of the prescribed term is binding as well upon the estate of the deceased as upon the surviving partner. Many other cases are to the same effect. *Gratz* v. *Bayard*, 11 Serg. & R. 41; *McNeish* v. *Oat Co.*, 57 Vt. 316; *Goodburn* v. *Stevens*, 5 Gill. 22. And so are the text-books. Story, Partn. § 319*a*; T. Pars. Partn. (2d Ed.) 469. Lindl. Partn. 866. We must therefore assume, I think, that the parties had a right to make the contract in question, and that it is operative, unless there is something in the further objection by the appellants that the contract attempts to create an illegal suspension of the absolute ownership of personal property, and also an unlawful accumulation "of the interest, income, or profit of personal property," in violation of the provisions of title 4, c. 4, pt. 2, of the Revised Statutes. 4 Rev. St. (8th Ed.) 2516. We are referred to no case which sustains the proposition that the statute referred to applies to an ordinary contract for a partnership, or for the continuance of the business of a partnership by a survivor to the end of a term. While all the partners are alive they have full control and there is no suspension of absolute ownership. Upon the death of one, the survivors become the legal owners of the assets,—take them, not as trustees, but as survivors holding the legal title, subject to the equitable right of the representatives of the deceased partner to have the assets applied according to the terms of the partnership. *Williams* v. *Whedon*, 109 N. Y. 333, 16 N. E. Rep. 365. So that in the present case there was no suspension of absolute ownership. The survivor, either alone or in connection with the representatives of the deceased, could transfer the absolute title. Inalienability can only exist when there are no persons in being who can convey a title. *Wetmore* v. *Parker*, 52 N. Y. 459, 460. See, also, *Garvey* v. *McDevitt*, 72 N. Y. 563; *Murray* v. *Murray*, 7 N. Y. St. Rep. 394. The power to convey at any time existed; the time when to convey depended upon the exigencies of the business. Nor was there any direction for the accumulation "of the interest, income, or profit of personal property" within the statute. There was nothing to prevent the division of profits, if any were earned, before the expiration of the term. It was therefore within the control of the survivor and the representatives of the deceased. There might never be any profits to divide. If there were any, it would hardly be proper to call them the profits of personal property. They would be the profits of the business, and depend very largely on the skill and energy of the partner in charge. In fact, in this case the main elements apparently would be the skill of the survivor on the one hand and the value of the patents on the other. It follows that the contract was valid. No other questions are presented by the appellants. The judgment should be affirmed. All concur.